Filed 2/6/14  In re I.R. CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re I.R. et al. Persons Coming Under the Juvenile Court Law. | B250809 (Los Angeles County Super. Ct. No. CK78139) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. F.N., Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County.  Carlos E. Vasquez, Judge.  Affirmed.

Joseph T. Tavano, under appointment by the Court of Appeal, for Defendant and Appellant.

James F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Sarah Vesecky, Deputy County Counsel, for Plaintiff and Respondent.

——————————————

The juvenile court adjudged minors I.R., born in 2006, and C.R., born in 2008, dependents of the court under Welfare and Institutions Code section 300, subdivision (b) (failure to protect).[1]  F.N. (Mother) appeals from the court's order summarily denying without a hearing her third section 388 petition for modification of the court's orders removing the minors from her care, placing them with family members, and terminating family reunification service.  In her third section 388 petition, Mother requested that the minors be returned to her care or in the alternative that family reunification services be continued to allow her to continue to progress and reunify with the minors.

Mother contends that the juvenile court erred in summarily denying without a hearing her third section 388 petition for modification because she presented prima facie evidence of changed circumstances and that the proposed change of order would promote the best interests of the minors.  Because Mother showed, at best, changing rather than changed circumstances, and failed to show that the proposed change of order would promote the best interests of the minors, we conclude that the court did not abuse its discretion when it summarily denied her section 388 petition.  E.R. (Father) is not a party to this appeal.  We affirm the order of the court.

## BACKGROUND

### A.  The section 300, subdivision (b) petition

On July 14, 2009, police officers referred the family to the Department of Children and Family Services (DCFS) after arresting Mother for "cruelty" to the minors.  Mother told the police that she had slapped the minors' faces because Father was having affairs with maternal grandmother and maternal aunt S.N.  She said "she did not want any children and only had the children because . . . [F]ather wanted children."  Mother did not appear to be mentally stable.

The minors were detained from Mother and Father on July 15, 2009, and placed with S.N. and her husband A.N.  On July 20, 2009, DCFS filed a section 300 petition, seeking to adjudge the minors dependent children of the juvenile court.  Paragraph b-1 of

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

the petition concerned altercations between Father and Mother. As amended and sustained, paragraph b-1 alleged under section 300, subdivision (b) that Mother and Father had a history of engaging in verbal and physical altercations, including Father striking Mother on the face, resulting in Mother's need for medical attention and Father being convicted of "inflicting injury to [M]other." The domestic violence between Mother and Father placed the minors at risk of harm.

Paragraph b-2 of the petition concerned Mother's physical abuse of the minors in July 2009. As amended and sustained, paragraph b-2 alleged under section 300, subdivision (b) that on July 14, 2009, Mother inappropriately physically disciplined the minors by slapping their faces, inflicting redness. Mother's conduct placed the minors at risk of harm.

Paragraph b-3 of the petition concerned Father's substance abuse. As amended and sustained, paragraph b-3 alleged under section 300, subdivision (b) that Father had an unresolved history of substance abuse, including use of methamphetamine, which periodically limited his ability to provide regular care for the minors, thereby placing them at risk of harm.

The report presented by DCFS on July 20, 2009, in preparation for the detention hearing contained the following information. Mother told DCFS the following on July 15, 2009, at a team decision-making meeting (TDM). "Last month," she argued with Father, accusing him of having an affair with maternal grandmother. When Father left home after the argument, Mother slapped the minors' faces "out of anger." When Father learned Mother had slapped the minors, he grabbed her face and told her that if she ever hurt the minors, he would call the police. On one occasion, after Father hit Mother in the eye, he was arrested by the police. Father has been high on crystal methamphetamine in the presence of the minors, but stopped using drugs two or three months earlier. Mother thought everyone was against her and out to get her. Mother wanted to buy a lie detector machine.

Father told DCFS the following on July 14, 2009. Father believed Mother was depressed. "[T]wo months ago," Father and Mother had become involved in a verbal

3

dispute. Father pushed, but not did hit, Mother's face. Father left the family home for a few days. When he returned home, I.R. told him Mother had slapped him in the face. Previously, Father had been arrested for domestic violence for giving Mother a black eye and subsequently completed a domestic violence program. At the TDM, Father stated that at times he had been high on crystal methamphetamine while in the presence of the children. Both Mother and Father stated at the TDM that they argued in the presence of the minors.

Maternal grandmother reported at the TDM on July 15, 2009, that Mother "has always had anger problems because [Mother] is always arguing with everyone." She thought Mother had a mental health problem, partly because Mother believed that maternal grandmother was having a sexual relationship with Father, which was untrue.

On July 14, 2009, S.N. told DCFS that Mother was suffering from postpartum depression; Mother believed Father was having an affair with maternal grandmother; Father had hit Mother; and Father had anger management and drug problems.

A.N. reported at the TDM on July 15, 2009, that he noticed Mother had been acting aggressively toward maternal grandmother and maternal cousins for the past few months.

Maternal cousin Yvette N. reported at the TDM on July 15, 2009, that Mother argued with everyone; believed everyone was out to get her; made statements that did not make sense; and once stood in the middle of an alley, "yelling and raising her arms and saying that she looks good and everyone is jealous of her." She did not believe the minors were safe with Mother and Father.

On July 20, 2009, the juvenile court detained the minors from Mother's and Father's care and ordered them placed with maternal aunt S.N. and her husband A.N.

The report presented by DCFS on August 14, 2009, in preparation for the jurisdiction and dispositional hearing contained the following information. On August 5, 2009, when DCFS interviewed Mother, she presented with a flat affect and answered questions very slowly with a low, calm voice. She stated that she had not sought prenatal

4

care because she was "too busy." She stated that Father had yelled at her and thrown things around the house and that he had hit her in the face about three times.

On August 5, 2009, Father told DCFS the following. He noticed a change in Mother after she gave birth to I.R. Father believed she was depressed and needed psychological assistance. When Father returned home after his fight with Mother, I.R. told him that Mother had hit him and Father noticed that I.R.'s and C.R.'s cheeks were red. Mother told Father that Father should treat her "good" if he wanted her to treat the minors "right." Father told Mother that if she ever hurt the minors again he would call the police. Father started using crystal methamphetamine around 1999, on a weekly to monthly basis, and had last used drugs in 2008.

DCFS interviewed S.N. on an undesignated date. She reported the following. She did not believe the minors were safe in Mother's and Father's care. After the minors were placed with S.N., Mother acted "strange" during visits. On August 5, 2009, Mother kept repeating the phrase, "'Everything given to you is good.'" Mother "did not interact a lot" with the minors during visits and spent most of the time applying makeup or sitting by herself. The minors did not want to play with Mother but wanted to play with Father. Once, when Mother attempted to change C.R.'s diaper, C.R. began crying uncontrollably. On another occasion, Mother wiped C.R. very roughly when she had a diaper rash. After that, S.N. would not allow Mother to change C.R.'s diapers.

DCFS submitted a report to the juvenile court dated October 2, 2009. It stated that in August 2009, maternal grandmother and S.N. had reported to the police and DCFS that Mother had called maternal grandmother, accused her of sleeping with Father, and said, "'I am going to beat you up with a baseball bat until you are dead, when all of this is over.'" Maternal grandmother did not know why Mother would say these things to her and believed Mother had been under the influence of a controlled substance. Both maternal grandmother and S.N. were concerned that Mother would carry out her threats and harm them or the minors.

**B. The jurisdictional and dispositional hearing**

On October 2, 2009, a jurisdictional and dispositional hearing was held. The juvenile court sustained the section 300 petition as amended, removed the minors from Mother's and Father's custody, declared the minors dependents of the court, and ordered DCFS to provide Mother and Father with family reunification services. Mother and Father were ordered to have monitored visits. Mother was ordered to complete parenting and anger management programs and to participate in individual counseling, addressing issues of domestic violence. Father was also ordered into programs. The minors were placed with S.N. and A.N.

**C. Mother's instability continues**

In April 2010, Mother was found guilty of violating Penal Code section 273a, subdivision (b) (willful injury to child) based on the slapping incident alleged in the section 300 petition, placed on summary probation, and ordered to complete a 52-week parenting program, a child abuse program, and a domestic violence program. Mother completed all three.

However, Mother continued to demonstrate instability. Relatives reported on December 13, 2010, that Mother was being hospitalized and placed on a psychiatric hold for approximately 10 days after displaying "unstable mental health." Later, it was determined that Mother was hospitalized from December 14, 2010, to December 22, 2010. Relatives stated Mother wanted to take the minors to the beach at late hours; Mother made false accusations; Mother displayed poor insight and paranoia; Mother looked at relatives with a prolonged, "non-blinking," intimidating stare; and Mother demonstrated poor ability to care for the minors. Mother's maternal great-aunt, Maria N., with whom the minors had been re-placed, told DCFS that Mother was not taking her medication; had been psychologically unstable for the past two weeks; had tried to attack maternal grandmother; seemed to want to attack Maria N.; and accused relatives of posting naked pictures of her on the Internet. Mother denied the reports of her relatives.

On January 13, 2011, relatives met with DCFS and reported that they suspected Mother was not taking the medication prescribed to her after her hospitalization. One

family member made a reference to "'schizophrenia.'" DCFS was unable to assess Mother's mental health because Mother refused to release the records of her hospitalization to DCFS and refused to state what medications she had been prescribed. Meanwhile, the minors were bonded to Maria N., well adjusted, developmentally on target, and in good health.

On March 7, 2011, the juvenile court terminated the order requiring DCFS to place the minors outside Mother's and Father's care, and ordered the minors placed in the home of Mother on the condition Mother reside in Maria and Jorge N.'s home with the minors.

On August 23, 2011, Mother's therapist reported that Mother had been consistent with her therapy sessions and demonstrated interest in parenting. On August 23, 2011, the minors' therapist reported that during conjoint sessions, Mother had difficulty in engaging and responding to the minors' needs and emotional state.

In February 2012, Mother's therapist reported to DCFS that Mother was not always receptive to therapy, appeared to not "'want to be here,'" was not always coherent, and was difficult to engage and inconsistent in her disclosures. Subsequently, Mother refused intensive services and did not follow through with referrals and instructions. Meanwhile, Mother had resumed her relationship with Father, who had tested positive for methamphetamine.

Mother's treating psychiatrist, Dr. Elizabeth Zaleski from LAC–U.S.C. Medical Center, reported on February 24, 2012, that Mother attended her appointments regularly, "has endorsed ongoing improvement to remission of her symptoms, and has reported a good level of functioning, as per her report of attending school full-time as well as taking care of her children." Dr. Zaleski reported that Mother's diagnosis was psychotic disorder, not otherwise specified, and adjustment disorder with disturbance of conduct. Mother was prescribed two medications and "has been adhering to her medications and to the treatment plan as agreed upon with this physician."

On March 5, 2012, DCFS reported that Mother did not sleep in Maria N.'s home and maternal grandmother, who also resided in Maria N.'s home, provided primary care

7

to the minors. DCFS reported that Mother "escalates and appears impulsive, erratic, aggressive, verbally abusive, very suspicious with fragment thought; at times incoherent, and has been physically aggressive to other adults in the caregiver's home." Mother had pulled maternal grandmother's hair and pushed Maria N. Maria N. and maternal grandmother stated that they no longer wanted Mother to live in their home. DCFS reported that during a TDM in February 2012, Mother insulted her relatives; used vulgar language; motioned with her open hand over Jorge N.'s nose; was out of control; and "appeared with difficulty to grasp concepts related to child safety and her role as the parent." Security guards were required to escort the relatives to the parking lot from the meeting in order to protect them from Mother. Relatives expressed fear of Mother and stated they did not believe Mother could manage the minors, who would be unsafe in her care. DCFS stated "it is believed that [Mother] may not have been taking her medication consistently."

On April 16, 2012, Mother explained to DCFS that she had lost control at the TDM because, "[My] mother couldn't guide me and I don't understand why you would give my kids to her. They (parental relatives) didn't support me emotionally and my mother didn't support me or guide me the way a mother is supposed to. They are only interested in harming me. I would ignore them but they kept on getting involved in my life only to cause me harm. If they didn't support me then how are they going to raise my kids?" Mother constantly repeated herself and asked the DCFS caseworker 10 times if she was taking notes.

**D. The section 342 petition**

On April 6, 2012, a previously filed section 342 petition having been dismissed, DCFS filed a section 342 petition. Under section 342, "In any case in which a minor has been found to be a person described by Section 300 and the petitioner alleges new facts or circumstances, other than those under which the original petition was sustained, sufficient to state that the minor is a person described in Section 300, the petitioner shall file a subsequent petition." This section 342 petition was different from the previous one

8

in that the previous one was based on the "slapping" incident and other things, whereas the April 6, 2012 petition was based on Mother's mental health and emotional problems.

As amended and sustained, paragraph b-3 of the section 342 petition alleged that Mother had a history of mental and emotional problems. She was placed on a psychiatric hold on December 14, 2010, diagnosed with psychotic disorder not otherwise specified, and prescribed medication. Mother continued to display erratic and aggressive behavior toward family members, including pushing and yelling at maternal great-aunt Maria N. Other allegations made pursuant to section 300, subdivisions (a) and (b) were dismissed.

On April 24, 2012, the juvenile court sustained the section 342 petition; terminated family reunification services; terminated the order placing the minors at the home of Mother; ordered DCFS to place the minors outside the care of Mother and Father; ordered Mother's and Father's visits to be monitored; and set a section 366.26 hearing to terminate parental rights and place the children permanently.

### E. The section 388 petitions

Subsequently, Mother filed three section 388 petitions, requesting that the minors be returned to her care or in the alternative that family reunification services be continued with the objective of allowing Mother to continue to progress and reunify with the minors. The juvenile court denied Mother's three section 388 petitions. The events leading up to the court's denial of the section 388 petitions are as follows.

Mother filed the first section 388 petition on August 24, 2012, contending that circumstances had changed because she had addressed the case issues; her psychiatrist had changed her prescriptions; she had been responding very well to the new prescriptions; she had continued individual counseling; and she was learning about tools to deal with her mental health on a daily basis. Attached to the petition was a letter dated August 21, 2012, from Mother's treating then-current psychiatrist, Dr. Mirza Baig, from LAC–USC Adult Outpatient Psychiatry Clinic, which stated that Mother had previously suffered from symptoms, including hallucinations, paranoid ideation, and "ideas of reference," but that her symptoms had improved significantly, she reported no acute

psychiatric symptoms and was undergoing continued assessment and treatment at the clinic.

The August 24, 2012 section 388 petition argued it was in the best interests of the minors to be placed in Mother's custody because she had been visiting the minors consistently; the minors enjoyed their time with Mother; the most permanent placement was in Mother's custody; and it was always in the best interests of the minors to place them in the most permanent placement. Mother requested the minors be returned to her care or in the alternative that family reunification services be continued, including unmonitored overnight visits.

In connection with Mother's August 24, 2012 petition, DCFS reported that Mother had difficulty engaging with I.R. during visits and when Mother pressured him for attention, he would cry. Mother's counseling program had reported to DCFS that Mother had been terminated from the program on June 18, 2012, because she used "'inappropriate'" language toward her therapist; was "'highly resistant to identify goals; demonstrated no insight toward areas that need work.'" Mother had failed to follow program guidelines and conform to expected behavior, was resistant to establishing treatment goals regarding her relationship problems, and had demonstrated a lack of progress despite participating in individual counseling from March 2, 2010. Mother told her therapist she did not need therapy and only attended because she was required to do so by a court order. Mother's therapist recommended that Mother seek comprehensive mental health services.

Mother sought therapy elsewhere. The therapist at the new agency stated on August 15, 2012, that Mother "seems willing to make the necessary changes to be able to be reunified with her children," but subsequently reported Mother demonstrated erratic behaviors, verbal altercations, poor sense of boundaries, fragmented thought process, verbal escalations, and an intense stare. The therapist reported that Mother "'looked at me like she was going to kill me . . . I was afraid . . . she looked angry'" and that the agency might refer Mother out for more comprehensive services.

10

In a letter dated October 29, 2012, Mother's treating psychiatrist, Dr. Baig, opined that Mother's "psychotic symptoms have improved significantly, and resolved approximately 1–2 years ago from today's date, 10/23/12. At this time, the patient is reporting no psychotic or acute psychiatric symptoms. . . . The current plan of care is to continue antipsychotic medication."

After hearing argument, the juvenile court denied Mother's first section 388 petition, concluding that she had not demonstrated either a change in circumstances or that the best interests of the minors would be promoted by the proposed change of order. The court noted that the original petition had been filed on July 20, 2009, three years previously. The court also continued the section 366.26 hearing to terminate parental rights in order to give DCFS time to complete an adoption home study, noting that neither Mother nor Father had provided the court with any evidence that termination of parental rights would be detrimental to the minors.

Mother filed a second section 388 petition on February 26, 2013, contending that circumstances had changed because she had completed a job readiness training program; she had been treated at the Adult Outpatient Psychiatry Clinic at LAC–USC; and she had not experienced any setbacks for at least one year. The petition attached a letter from Mother's treating psychiatrist, Dr. Baig, dated January 9, 2013, stating that Mother had regularly attended appointments; Mother had not had any known psychotic episodes for at least one year; antipsychotic treatment had been discontinued because Mother was stable and lacked symptoms; but there was concern for recurrence of symptoms which would be monitored during future appointments. A month later, Dr. Baig reported that Mother's current diagnosis included schizophrenia, residual type. She reported, "The treatment recommendations include administration of antipsychotic medication in addition to supportive therapy. At the current time [Mother] refuses to undergo psychotropic treatment." The treatment plan included encouragement of psychotropic use, regular follow-up appointments to monitor for active symptoms of psychosis, and psychosocial interventions as indicated.

11

The February 26, 2013 section 388 petition argued it was in the best interests of the minors to be placed in Mother's custody because she had been visiting the minors consistently; the minors enjoyed their time with Mother; and the most permanent placement was in Mother's custody. Mother requested the minors be returned to her care or in the alternative that family reunification services be continued, including unmonitored overnight visits.

In connection with Mother's February 26, 2013 petition, DCFS reported that in January 2013, Mother had to be escorted out of a meeting at a DCFS office because she was "difficult to engage." In February 2013, Father told DCFS that at Mother's insistence, Father had made inaccurate statements "'as a witness.'" Maternal grandfather reported on April 2, 2013, that Mother had engaged in a verbal altercation with him. Maria N. reported that Mother had difficulty engaging with I.R. during visits; had unrealistic expectations for the minors; and could not sustain their attention. On October 24, 2012, Mother had enrolled in individual therapy with an agency that reported to DCFS on March 28, 2013 that it had become difficult to ascertain whether Mother was benefiting from her treatment because she denied responsibility for the case issues and demonstrated continuous emotional instability. The agency reported that Mother blamed others; relentlessly criticized "Case Authorities for not seeing the Case issues her way"; and did not want to take responsibility for the removal of the minors. The agency recommended Mother undergo an evaluation by a doctor under Evidence Code section 730, which permits the trial court to appoint an expert to investigate, issue a report, and testify as an expert.

On April 9, 2013, after hearing argument, the juvenile court denied Mother's second section 388 petition, concluding that Mother failed to demonstrate either a change in circumstances or that the best interests of the minors would be promoted by the proposed change of order. The court stated that Mother had not provided DCFS with substantial proof of participation in or completion of her programs and had not addressed her mental health needs.

Mother filed her third section 388 petition on August 6, 2013, the same day that the section 366.26 hearing for termination of parental rights was scheduled to occur. The August 6, 2013 section 388 petition is the one at issue here. Mother contended that circumstances had changed because she continued to visit the minors, help them with their homework, and maintain employment. Mother attached a letter dated July 29, 2013, from a counselor at West Advisory Christian Counseling Center that stated that Mother was attending individual counseling sessions twice a week and that Mother had addressed case-related issues, such as domestic violence, physical abuse, anger management, emotional abuse, child abuse, child neglect, child endangerment, self-esteem issues, parenting, and other life skill techniques. The letter advised that Mother admitted to past negative behavior toward family members; Mother self-reported that she was using new learned techniques on a daily basis as coping mechanisms; and Mother stated she missed the minors and wished to provide for them. The letter noted that Mother seemed respectful and sincere; attended church; worked part time; and had started a paralegal internship. The letter indicated that Mother self-reported that she was taking her prescription medications on a daily basis, understood the importance of taking her medications, and that Mother's therapist had not observed anything to make her think Mother would pose a risk to the minors. It recommended Mother continue with individual counseling to continue developing a clear understanding of family dynamics. The letter did not indicate how long Mother had been attending the program.

The August 6, 2013 section 388 petition argued it was in the best interests of the minors to be placed in Mother's custody because she had been visiting the minors consistently; it was best to keep siblings together in a permanent plan; and the most permanent placement was in Mother's custody. Mother again requested the minors be returned to her care or in the alternative that family reunification services be continued to allow Mother to progress and reunify with the minors.

In connection with Mother's August 6, 2013 petition, DCFS stated that Mother was consistent with monitored visits. No major issues had been reported, but Mother continued to have difficulty engaging with I.R.; had unrealistic expectations for the

13

minors; and was unable to sustain their attention. At the time of the report, Mother had not contacted her caseworker and DCFS had not received any information regarding Mother's compliance with treatment recommendations made in February 2013 by Mother's treating psychiatrist, Dr. Baig.

DCFS argued that the third section 388 petition was not timely and that because the section 366.26 hearing originally had been set in September 2012 and continued, the section 388 petition was "not really relevant at this point." The minors' counsel joined with DCFS, urging that the section 388 petition indicated at best that Mother was "making progress, not that the circumstances are completely changed and that it doesn't allege why the children would be better situated in the home of . . . [M]other." Mother's counsel requested a hearing to address Mother's progress and letters from Mother's current counselor. The juvenile court concluded that the petition did not make a prima facie showing of a change in circumstances or a showing that the modification would be in the best interests of the minors and denied the petition without a hearing.

## F. The section 366.26 hearing

The juvenile court conducted the section 366.26 hearing immediately after it summarily denied Mother's third section 388 petition. DCFS reported that maternal great-aunt Maria N. and her husband Jorge N. wanted to adopt the minors and an adoption home study had been completed pending final administrative approval. After ordering Mother removed from the courtroom for engaging in disruptive behavior, raising her voice, and failing to comply with the court's request to keep her voice down, the court terminated parental rights and freed the minors for adoption. Mother appealed.

## DISCUSSION

**The juvenile court did not abuse its discretion in summarily denying Mother's third section 388 petition**

Mother contends that she presented prima facie evidence to support an evidentiary hearing on her third section 388 petition and therefore the juvenile court's summary denial of the August 6, 2013 petition was an abuse of discretion. We disagree.

14

Section 388, subdivision (a)(1) states in pertinent part: "Any parent or other person having an interest in a child who is a dependent child of the juvenile court . . . may, upon grounds of change of circumstance or new evidence, petition the court in the same action in which the child was found to be a dependent child of the juvenile court . . . for a hearing to change, modify, or set aside any order of court previously made or to terminate the jurisdiction of the court. The petition shall . . . set forth in concise language any change of circumstance or new evidence that is alleged to require the change of order or termination of jurisdiction." Section 388, subdivision (d) provides: "If it appears that the best interests of the child . . . may be promoted by the proposed change of order, . . . the court shall order that a hearing be held and shall give prior notice . . . ."

"[I]f the liberally construed allegations of the petition do not make a prima facie showing of changed circumstances and that the proposed change would promote the best interests of the child, the court need not order a hearing on the petition." (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 806.) "The prima facie requirement is not met unless the facts alleged, if supported by evidence given credit at the hearing, would sustain a favorable decision on the petition." (*Ibid.*) We review the juvenile court's order for abuse of discretion. (*In re Casey D.* (1999) 70 Cal.App.4th 38, 47.) Changed, not changing, circumstances must be demonstrated. (*Ibid.*)

We conclude the juvenile court did not abuse its discretion by summarily denying Mother's third section 388 petition without a hearing. Our review of Mother's third section 388 petition, which was made on the same day as the scheduled section 366.26 hearing, shows that she made general, conclusory allegations which failed to establish a prima facie showing of changed circumstances or that the proposed change of order would promote the best interests of the minors. (*In re Edward H.* (1996) 43 Cal.App.4th 584, 593.)

### A. Changed circumstances

Mother's allegations that she continued to visit the minors, help them with their homework, and maintain employment simply are not evidence of changed circumstances. Nor is the letter dated July 29, 2013, from a therapist, which Mother claimed shows her

15

"successful and positive participation in counseling, as well as the therapist's opinion [Mother] no longer posed a risk to her children." Taken in the context of Mother's long erratic history, they are only indications of a possible short-term improvement, which might or might not become sustained in the future.

We disagree with Mother's argument that the July 2013 letter "added much more than presented in her previous section 388 petition." While Mother quotes extensively from the therapist's letter, our examination of the letter shows that, at most, Mother's treatment was in progress and had not been completed. The therapist's letter did not indicate when Mother started the counseling program, but it seems likely that the sessions began only after the second section 388 petition had been denied in April 2013. Although the therapist opined that Mother seemed sincere, self-reported compliance with psychotropic medication, admitted to past negative behavior, and had attended counseling sessions twice a week, the therapist recommended that Mother "continue with individual counseling to continue developing a clear understanding of the family dynamics." Further, the therapist did not affirmatively state that Mother no longer posed a risk to the minors, but stated only that she had not observed anything "during counseling sessions" that would make her think Mother would pose a risk to her children.

Unfortunately, Mother has a long history of initially being compliant with counseling and addressing case issues; receiving positive reports and being compliant with psychotropic medications; then becoming angry, violent, inconsistent about disclosures, difficult to engage, and resistant to counseling and noncompliant with psychotropic medications. Mother had stated to one therapist that the only reason she was in counseling was because she was required by court order to do so. After initial cooperative behavior, Mother had intimidated a program administrator by "look[ing] at [her] like she was going to kill [her]."

Even though Mother had self-reported to the current therapist that she was in compliance with her psychotropic medication, the therapist did not verify that information with Mother's psychiatrist. In addition, Mother did not submit updated information from her psychiatrist, who had stated in February 2013 that Mother's

16

diagnosis included schizophrenia and that she refused to undergo psychotropic treatment. Regrettably, Mother's chronic, longstanding mental and emotional issues could only have been found to be resolved or mitigated after sustained and substantial success in treatment. Her third section 388 petition fell far short of this mark and did not add materially to the information that the juvenile court had before it at the April 2013 hearing and the previous hearing on October 29, 2012.

Nor are we convinced otherwise by Mother's citation to *In re Hashem H.* (1996) 45 Cal.App.4th 1791, where the appellate court reversed the juvenile court's order denying the mother's two section 388 petitions without a hearing. In that case, the appellate court held that the mother had made a prima facie showing of changed circumstances by establishing that her mental and emotional problems had been successfully resolved through therapy. There the mother had regularly and consistently participated in therapy for 18 months; maintained full-time employment; had a stable religious affiliation; had attached a letter from her therapist recommending that the minor be returned to her custody, describing in detail how the mother had worked on problem solving and parenting issues; had participated in successful weekly and overnight visits; had a network of friends who would assist her; and could provide a stable, predictable, and secure environment for the minor on a full-time basis. (*Id.* at pp. 1798, 1799.)

The showing made by the mother in *In re Hashem H.* was far more extensive than Mother's showing here. There the mother was able to demonstrate "that she had overcome her problems through conscientious and successful individual and conjoint counseling over a lengthy period of time; that she maintained a consistent relationship with her son, including weekly visitation; and that she filed written section 388 petitions *before* the date set for the section 366.26 hearing setting out these changed circumstances." (*In re Hashem H.*, *supra*, 45 Cal.App.4th at p. 1800.) In contrast, here Mother has offered a bare scintilla of proof of changing, not changed, circumstances. (*In re Baby Boy L.* (1994) 24 Cal.App.4th 596, 610 [mere prima facie showing of changing circumstances insufficient to justify hearing on section 388 petition after two years of

17

removal].)  The juvenile court did not abuse its discretion in finding Mother failed to make a prima facie showing of changed circumstances.

### B.  Best interests of the minors

Mother was also required to make a prima facie showing that the best interests of the minors would be promoted by placing them in her custody.  We determine that the juvenile court did not abuse its discretion in concluding that she did not make such a prima facie showing.  "[U]p until the time the section 366.26 hearing is set, the parent's interest in reunification is given precedence over the child's need for stability and permanency."  (*In re Marilyn H*. (1993) 5 Cal.4th 295, 310.)  However, after termination of reunification services, it is presumed that continued care is in the best interests of the child.  (*Ibid*.)  In her third section 388 petition, Mother merely reiterated the conclusory language from her first and second section 388 petitions that she had been visiting the minors consistently; it was best to keep siblings together in a permanent plan; and the most permanent placement was in Mother's custody.

At the time of the third section 388 petition, C.R. and I.R. had been removed from Mother's care for most of their lives, after an unsuccessful attempt to place the minors in Mother's care in 2011.  Although Mother sometimes behaved properly on her visits with the minors, more often she was disengaged, rough in manner, and unable to interact properly with them.  The latest report indicated that Mother had difficulty engaging with I.R., had unrealistic expectations of the minors, and could not sustain their attention.  Even though Mother had over three years to reunify with them, she had never assumed a parental role to them after they had been removed from her care.  Rather, maternal grandmother provided primary care for the minors.  By the time of the section 366.26 hearing, which had been continued from September 2012, the best interests of the minors, rather than reunification with the minors, had become the focus of the proceedings.  The minors were thriving under the loving and supportive care of maternal great-aunt Maria N. and Jorge N., who wished to adopt them.  Moreover, because the minors are to be placed with relatives, it is unlikely that the minors will be deprived absolutely of a relationship with Mother.  We conclude that Mother did not show how the minors' best

18

interests would be served by depriving them of a permanent, stable home in exchange for an uncertain future.

Mother did not establish a prima facie showing of both a change of circumstances and that a change of order would be in the best interests of the minors. Accordingly, we conclude that the juvenile court did not err by denying Mother a hearing on her third section 388 petition. We need not address Mother's contention that if we reverse the order denying her third section 388 petition, we must reverse the order terminating her parental rights.

**DISPOSITION**

The juvenile court's August 6, 2013 order denying F.N.'s Welfare and Institutions Code section 388 petition is affirmed.

NOT TO BE PUBLISHED.


MILLER, J.[*]

We concur:


ROTHSCHILD, Acting P. J.


JOHNSON, J.

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.